490

ASOCIACION COLOMBIANA DE EXPORTADORES DE FLORES, ET AL., PLAINTIFFS *v.* UNITED STATES, DEFENDANT, AND FLORAL TRADE COUNCIL, DEFENDANT-INTERVENOR

Consolidated Court No. 94–04–00204

(Dated April 6, 1995)

*Arnold & Porter (Michael T. Shor)* for plaintiffs Asociacion Colombiana de Exportadores de Flores and the Government of Colombia.

*Frank M. Hunger,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Michael S. Kane), Patrick Gallagher,* Attorney Advisor, United States Department of Commerce, of counsel, for defendant.

*Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr.* and *Amy S. Dwyer)* for defendant-intervenor Floral Trade Council.

## OPINION

RESTANI, *Judge:* Plaintiffs, the Government of Colombia ("GOC") and Asociacion Colombiana de Exportadores de Flores, a group of Colombian growers and exporters of carnations, roses, and other cut flowers, challenge the final results of the International Trade Administration of the United States Department of Commerce ("Commerce") in *Miniature Carnations from Colombia,* 59 Fed. Reg. 10,790 (Dep't Comm. 1994) (final results of countervailing duty admin. review), and in *Roses and Other Cut Flowers from Colombia,* 59 Fed. Reg. 10,796 (Dep't Comm. 1994) (final), denying plaintiffs' request to terminate suspended countervailing duty investigations on Colombian flower growers and exporters. Plaintiffs assert that Commerce's decision was not supported by substantial evidence or was not in accordance with law.

## FACTS

On August 6, 1982, Commerce received a petition alleging that the GOC was subsidizing manufacturers, producers or exporters of roses and other cut flowers. *Roses and Other Fresh Cut Flowers from Colombia,* 47 Fed. Reg. 38,570, 38,570 (Dep't Comm. 1982) (notice of initiation). Following a countervailing duty investigation in response to these contentions, Commerce published a notice on November 5, 1982, placing preliminary, affirmative countervailing duties on roses and other cut flowers (excluding miniature carnations). *See Roses and Other Cut Flowers from Colombia,* 47 Fed. Reg. 50,314 (Dep't Comm. 1982) (prelim.). Soon after, however, the investigation was suspended, as Colombian flower growers and exporters, accounting for at least 85% of exports to the United States, agreed to renounce any export subsidy provided by the GOC under its Tax Reimbursement Certificate (CAT/CERT) program. *See Roses and Other Cut Flowers from Colombia,* 48 Fed. Reg. 2158 (Dep't Comm. 1983) (suspension of investigation). Almost four years later, on December 15, 1986, the Colombian growers and

exporters further agreed to extend the suspension agreement to cover additional programs, including the PROEXPO and Plan Vallejo programs.[1] *See Roses and Other Cut Flowers from Colombia,* 51 Fed. Reg. 44,930, 44,932–34 (Dep't Comm. 1986) (revised suspension agreement).

U.S. flower producers filed a petition on May 21, 1986, alleging that the GOC was also subsidizing exports of miniature carnations. Following an investigation, Commerce imposed preliminary, affirmative countervailing duties on miniature carnations. *See Miniature Carnations from Colombia,* 51 Fed. Reg. 37,934 (Dep't Comm. 1986) (prelim.). As with the previous flower investigation, this investigation was suspended by an agreement of January 13, 1987, between Commerce and Colombian flower growers and exporters accounting for at least 85% of U.S. imports of miniature carnations from Colombia. The terms of this agreement were virtually identical to the amended "rose agreement" made on December 15, 1986. *See Miniature Carnations from Colombia,* 52 Fed. Reg. 1353 (Dep't Comm. 1987) (suspension of investigation).

On January 31, 1991, the GOC requested that Commerce terminate the two suspended countervailing duty investigations pursuant to 19 C.F.R. § 355.25(a)(1) (1991). The GOC stated that it had abolished all subsidy programs found countervailable for the merchandise at issue for the requisite three year period between January 1, 1988, through December 31, 1990. It also submitted the required certification promising not to reinstate its current programs nor substitute other programs, in accordance with 19 C.F.R. § 355.25(b)(1) (1991).

Commerce initiated an administrative review with regard to the request, and on October 7, 1993, published its preliminary intent not to terminate the suspended investigations even though "the GOC and signatory companies have complied with all the terms of the suspension agreement during the period January 1, 1988, through December 31, 1990." *See Miniature Carnations from Colombia,* 58 Fed. Reg. 52,269, 52,272 (Dep't Comm. 1993) (prelim. results); *Roses and Other Cut Flowers from Colombia,* 58 Fed. Reg. 52,272, 52,275 (Dep't Comm. 1993) (prelim. results). On March 8, 1994, over three years after the GOC's requested review, Commerce published its final determination not to terminate the suspended investigations as the GOC's PROEXPO loan program and Plan Vallejo program for capital equipment were not deemed to have been abolished for three consecutive years within the meaning of 19 C.F.R. § 355.25(a)(1). *See* 59 Fed. Reg. at 10,795 (carnations); 59 Fed. Reg. at 10,797 (roses and other cut flowers). Because of the similarity between the two cases, challenges to the rose and carnation determinations have been consolidated in this action.

---

[1] The Fund for the Promotion of Export Loans ("PROEXPO") provided preferential loans to Colombian exporters. The Plan Vallejo program was designed to exempt Colombian exporters from certain taxes and import duties on capital equipment used for the production of goods which were to be exported.

492

STANDARD OF REVIEW

In reviewing final determinations in countervailing duty investigations, the court will hold unlawful those determinations found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(1988).

DISCUSSION

Under 19 C.F.R. § 355.25(a),[2] there are two grounds for terminating suspended investigations. The first, as reflected in § 355.25(a)(1), provides for termination based upon a two-prong test. The first prong requires the government of the affected country to eliminate all subsidy programs for the merchandise at issue for at least three consecutive years. The regulation specifically states that these programs must be "abolish[ed]." *See* 19 C.F.R. § 355.25(a)(1)(i). According to Commerce, "[a] program is effectively abolished when the government of the affected country has eliminated, by law, the eligibility of producer/exporters of the subject merchandise for the countervailable program." 59 Fed. Reg. at 10,791. The second prong requires that there be no likelihood that the government of the affected country would reinstate those programs or create alternate, countervailable programs in the future. 19 C.F.R. § 355.25(a)(1)(ii).

The second ground for termination is provided for in 19 C.F.R. § 355.25(a)(2), whereby the government need not take action to eliminate or abolish the countervailable programs. All that must be proven is that there has been a period of five consecutive years in which the signatories of the suspension agreement have not received or applied for subsidies under such programs.

Plaintiffs contend that the GOC effectively eliminated its subsidy programs, and therefore, after the three consecutive years, termination of the suspended investigations should have been granted pursuant to 19 C.F.R. § 355.25(a)(1). Defendants, on the other hand, assert that the GOC did not take sufficient action to abolish its subsidy programs, and may not be granted the requested termination.

I. *The PROEXPO Program:*

The PROEXPO program provided long- and short-term loans at preferential rates to Colombian exporters. In a separate investigation dealing with apparel from Colombia, Commerce determined these loans to

---

[2] Section 355.25(a) provides in pertinent part:

    (1) The Secretary may * * * terminate a suspended investigation if the Secretary concludes that:

        (i) The government of the affected country has eliminated all subsidies on the merchandise by abolishing for the merchandise, for a period of at least three consecutive years, all programs that the Secretary has found countervailable; and

        (ii) It is not likely that the government of the affected country will in the future reinstate for the merchandise those programs or substitute other countervailable programs.

    (2) The Secretary may * * * terminate a suspended investigation if the Secretary concludes that:

        (i) All producers and exporters covered at the time of revocation by * * * the suspension agreement have not applied for or received any net subsidy on the merchandise for a period of at least five consecutive years; and

        (ii) It is not likely that those persons will in the future apply for or receive any net subsidy on the merchandise from those programs the Secretary has found countervailable in any proceeding involving the affected country or from other countervailable programs.

19 C.F.R. § 355.25(a).

be "preferential" and consequently, countervailable because they were contingent on export and the interest rates were lower than those generally available to textile mills and apparel manufacturers from Colombia. *See Certain Textile Mill Products and Apparel from Colombia,* 49 Fed. Reg. 50,753, 50,755–56 (Dep't Comm. 1984) (prelim. affirmative countervailing duty determ.). Similarly, with respect to the Colombian flower industry, Commerce deemed the PROEXPO loan rates to be preferential as they were lower than those generally available to flower growers in Colombia. Commerce found that the major sources of agricultural financing were the Fund for Agricultural Financing and the Caja Agrarian Fund, both government agricultural funds (collectively "FFA"). Thus, Commerce used the average interest rates of FFA loans as the applicable benchmark interest rates.

At the time Commerce and the Colombian signatories entered into the suspension agreements of December 15, 1986, for roses and other cut flowers, and of January 13, 1987, for miniature carnations, Commerce did not require the flower growers and exporters to renounce the government PROEXPO loans. Rather, Colombian flower growers and exporters were only required to refinance their existing preferential PROEXPO loans and promise not to obtain preferential export financing in the future. As indicated, Commerce established a benchmark rate based on the FFA rate, which was to be the minimum interest rate on all PROEXPO loans for flowers exported to the United States from Colombia. *See* 51 Fed. Reg. 44,931–32. Thus, Commerce rejected the U.S. domestic industry's request that commercial rates be used as the benchmark. *See id.*

Commerce set the applicable benchmark rates at the averaged FFA rates of 21.0% for short-term loans and 22.5% for long-term loans. *See Miniature Carnations from Colombia,* 52 Fed. Reg. 32,033, 32,034–35 (Dep't Comm. 1987) (final). The rates were subject to prospective adjustment by Commerce. *See* 59 Fed. Reg. at 10,795. In order to conform with the suspension agreements, the GOC amended all PROEXPO resolutions (the legal regulations governing PROEXPO loans) to impose the minimum benchmark rates for flower growers and exporters.[3] Thus, the GOC ensured that, by law, all flower growers and exporters qualifying for the PROEXPO program could receive loans at interest rates no lower than the minimum benchmark rate set forth in the suspension agreements.

During the period of review, the interest rates on all PROEXPO loans to flower growers and exporters were significantly higher than required under the agreements. Instead of charging the FFA benchmark rates, the GOC charged a higher rate of interest based on the 90-day term de-

---

[3] *See* App. to Pls.' Mot. J. Agency R., Tab J, Resolution No. 011, at 3; Resolution No. 009, at 1, 3–4. For example, the resolution providing for pre-shipment short-term loans to exporters of flowers was amended to read "22.5% per year or the [DTF] rate paid * * * on the date the credit is approved, whichever is higher, payable quarterly at the end of each quarter." *Id.,* Tab J, Resolution No. 009, at 1.

posit rate ("DTF") on the day the loan was issued.[4] This averaged 28.4% in 1988, 27.95% in 1989, and 29.7% in 1990. Although only those producers and exporters who signed the suspension agreement were bound to these rates, the GOC amended all PROEXPO resolutions, adjusting them to the new rates, thereby applying the suspension agreements to all flower growers and exporters qualifying for PROEXPO loans.

Although Commerce acknowledged that the GOC did not confer subsidies through the PROEXPO program, it determined that the structure of the program merely constituted non-use of the preferential rates rather than an elimination of their availability as required under 19 C.F.R. § 355.25(a)(1)(i). Commerce based its determination on the fact that "[a]s the PROEXPO program is now structured, PROEXPO loans granted at interest rates at or above the current benchmarks could constitute countervailable subsidies if the commercial interest rate falls below the benchmark specified by the suspension agreements."[5] 59 Fed. Reg. at 10,795. Commerce explained that "[i]n such a case, producer/exporters would be eligible for countervailable benefits under PROEXPO without the GOC taking specific action to change the program." *Id.*

It is unclear as to whether, under Colombian regulations, the floor loan rate would float with the rate provided in the suspension agreements as updated, in which case no subsidies could be given under the program, and the program should be considered abolished. If this is so, Commerce would be required to address the second prong of the test for revocation based on the three-year period, that is, likelihood of reinstatement of the subsidy program. Because of the court's finding as to the Plan Vallejo program, *infra*, remand is not necessary for consideration of these matters regarding the PROEXPO program.

## II. *The Plan Vallejo Program:*

The Plan Vallejo program provided flower growers and exporters exemptions on import duties and certain other taxes for capital equipment used to produce exported finished goods. This program was administered by the government agency INCOMEX. As part of the December 15, 1986 and January 13, 1987 suspension agreements, the flower grower and export signatories promised to renounce any Plan Vallejo benefits. Subsequently, the GOC adopted the agreement to cover all flower growers and exporters.

Commerce verified that no flower growers or exporters received Plan Vallejo benefits during the period of review.[6] 59 Fed. Reg. at 10,795. Nevertheless, Commerce determined that the Plan Vallejo program had not

---

[4] Unlike the FFA rate, the DTF rate was not directly controlled by the GOC.

[5] In 1990, the GOC changed the FFA rate from a fixed interest rate to a variable interest rate based on the DTF rate. As a result, on April 18, 1991, Commerce set the short-term benchmark rate at DTF+1 and the long-term benchmark rate at DTF+1 plus 0.25 percentage points for each additional year after the first year. *See Miniature Carnations from Colombia,* 56 Fed. Reg. 14,240, 14,240 (Dep't Comm. 1991) (final).

[6] In 1987, INCOMEX inadvertently issued Plan Vallejo benefits to certain flower exporters. Immediately upon realizing that the benefits should no longer be provided to flower growers and exporters, INCOMEX repealed them. Commerce's August 18, 1989 report verified that the GOC had complied with the terms of the suspension agreements by revoking the benefits it had erroneously conferred. *See* App. to Pls.' Mot. J. Agency R., Tab Q, at 4–5.

been abolished in accordance with 19 C.F.R. § 355.25(a)(1)(i), as the GOC did not take affirmative action to abolish Plan Vallejo until 1991. Although the GOC has stated that "[a]s a matter of administrative policy, INCOMEX has not granted Plan Vallejo Duty and Tax Exemptions * * * to flower growers as of December 15, 1986," Commerce found that the GOC was merely stating that it had a "policy" not to grant Plan Vallejo benefits. *See* 59 Fed. Reg. at 10,795; App. to Pls.' Mot. J. Agency R., Tab M, at 10 (Aug. 8, 1991 questionnaire response). According to Commerce, a mere declaration of "policy" is not enough to abolish a practice. Therefore, it was not until INCOMEX published its January 24, 1991 or April 2, 1991 circular formally abolishing these benefits, that Plan Vallejo had been abolished in accordance with its regulations. *See* 59 Fed. Reg. at 10,795.

There is no dispute that the Plan Vallejo program was abolished; the only question is when. According to Commerce, 19 C.F.R. § 355.25(a)(1) requires the Colombian government to prove that it took some clearly identifiable action to abolish flower growers' and exporters' eligibility for Plan Vallejo benefits. The administrative record is bereft of any evidence of any affirmative, clearly identifiable action taken by the GOC to abolish growers' eligibility for benefits during the period of review. The only evidence plaintiffs brought forward was a circular dated January 24, 1991, which is outside the review period. This circular stated that the restriction on Plan Vallejo benefits would be maintained indefinitely as to Colombian producers and exporters of flowers to the United States and Puerto Rico. *See* App. to Pls.' Mot. J. Agency R., Tab N (Jan. 24, 1991 circular), Tab O (Apr. 1, 1991 circular). The circular also stated that this law was made retroactive to December 15, 1986, and that those receiving benefits after such date have had to reimburse the GOC for such benefits.

The fact that the GOC claimed that the plan had been abolished since December 15, 1986, in accordance with the suspension agreement, does not merit reversal of Commerce's decision. It was reasonable for Commerce to determine that an actual change in law is required to "abolish" a program and that a retroactive abolition is insufficient. Thus, Commerce was justified in concluding that the "policy" the GOC claimed to have had in effect since December 1986, merely reflected non-use of the Plan Vallejo exemptions in accordance with the suspension agreement published by Commerce. Although this evidence would support a termination finding under 19 C.F.R. § 355.25(a)(2), which requires plaintiff merely to prove "non-use" for five consecutive years, Commerce reasonably determined that the GOC's actions were insufficient to warrant termination under 19 C.F.R. § 355.25(a)(1). Similarly, the August 18, 1989 verification report would also be evidence of compliance with the suspension agreement under § 355.25(a)(2). *See supra* note 6. Under § 355.25(a)(1), however, it must be shown that the government took clearly identifiable actions to abolish the countervailable benefits as to the merchandise at issue. Thus, Commerce's finding, that the Plan Val-

lejo program was not abolished as of December 15, 1986, under its regulation, is supported by substantial evidence, and is in accordance with law.

## CONCLUSION

As 19 C.F.R. § 355.25(a)(1)(i) requires "all programs that the Secretary has found countervailable" to be abolished for the entire period of review, and Commerce properly determined that the Plan Vallejo program was not abolished, the court sustains Commerce's decision not to terminate the suspended investigations of Colombian flower growers and exporters based on the review period January 1, 1988, through December 31, 1990.